## STATEMWENT FOR THE RECORD

The date is February 21, 2005. I am returning from an early morning fishing trip. I am wearing an Old Navy brand sweatshirt, Champion sweat pants, a field grade army baseball type cap and athletic shoes. I was traveling west on 4th street approaching Jackson when I noticed a car that had been stopped by the police. The car was a low-rider type and closely resembled one driven by one of my clients. I pulled over and observed what was going on. As I could not clearly see who was driving or who was the passenger, I got out of my car and approached the car. As I got closer I discovered that neither of the occupants were my clients. I asked the driver why he had been stopped. Before he could answer, the officer had got out of his car and began shouting at me. I could not understand a word he said, but due to his temperament it was obvious that he was not in a good mood. I put my hands in front of me at mid chest level in acquiescence and merely told the officer that I was going to give the gentlemen in the car one of my business cards. I returned to my car, retrieved a business card and returned to the car on the other side of the street. As I approached the car I held the business card in my right hand and extended it toward the driver. At this time the officer got out of his car and came toward me. His temperament had not changed. He gave me a command that I could not hear, but it was clear that it was not the greeting of the day. In light of the fact that we were standing in traffic, I put both of my hands straight up in the air and walked three steps to the front of the car he had stopped. I still had my business card between my fingers. The officer grabbed my right hand, put it behind my back and cuffed it. He then proceeded to do the same with my left. This was not unexpected. But what he did next was. The officer viciously and brutally threw me to the ground. He then drove, with great force, his right knee into my right kidney area. The pain was excruciating. For one brief moment I thought his weapon had accidentally discharged and I had been shot. The officer pulled me to the curb and told me I was under arrest. Due to the fact that I was sitting on the curb in hand cuffs and badly beaten, I had already figured that out (pun intended).

The officer never told me at the scene what I was under arrest for. He never at any time read me my Miranda rights. I informed the officer that I was hurt and required medical attention. When we arrived at the hospital I was placed in a small room which I assumed was in the emergency section. I was placed in a seat. The arresting officer sat to the right of me. To my left was a door, which had a 12X12 glass that was half-open. I could see that there were two officers behind it who were engaging in conversation.

I could see one of the officers and he could see me. A lady, who I assumed to be a nurse, came into the room and attached a white wristband to my right arm. She said I would be seen as soon as possible. I informed the officer to my right that I wanted to see someone from Internal Affairs. His only reply, in a very loud voice was, "you want to see someone from Internal Affairs?". At this time the large officer who had been observing me, and I him entered the room. He said that he was Internal Affairs. The officer was in uniform. He had three stripes down with a rocker. I assumed him to be a Senior Sergeant. I reaped my request and he maintained that he was Internal Affairs. I told him that I may have been born on a Sunday, but I wasn't born yesterday. He noticed my army baseball type cap and asked me if I had served in the army. I told him yes and then the conversation softened and became more cordial. The officer who claimed to be with Internal Affairs asked me if I was really hurt. I told him that I was sore. He suggested that I go back to the station. He stated those I would be charged with disorderly conduct, sign some papers and be home for dinner. I figured that I would cut my losses and go along to get along. I was taken to the station and placed in a cell. I was told that I could not use any money I had on me to make bail. I could not make a phone call until I had seen the judge. I lay on the floor of that cell for about four hours before I was sent to see the judge via video. At that time I discovered that I was charged with disorderly conduct as promised. But three additional charges were added. I made bail and was released. Due to the fact that I was in severe pain, my wife suggested that I not attempt to try to drive to my home in New Jersey, but instead spend the night with her, which I did. During that night I had trouble sleeping. I would often get up to go into the den and watch TV. At about 0430 my wife came into the den and asked me to come with her. We went into bedroom and she pointed out a large splotch of blood on my side of the bed. She directed me to strip down. My left knee had a minor cut. My left elbow had a major laceration. My wife got her camera and photographed the injuries. They have been developed and are available for Internal Affairs to examine at their convenience.

The next day (Tuesday February 22) I went to the Wilmington Police Department to speak with someone from Internal Affairs. On this day I wore a brown business suit with brown silk tie and highly polished shoes. I approached an officer at the desk leading to court 20. And asked him how I could get to Internal Affairs. He told me I told me I would have to go to the House Sergeant and directed me on how to get there.

The House Sergeant that day was a lady. She wore three stripes and a rocker. I informed her that I wanted to see someone from Internal Affairs. She asked what it was in regards to and I briefly explained the incident. Prior to entering her area, I removed my ID badge and put it in my pocket. She never asked me my name. She excused herself and said she would check on it. She went through a rear door and was there for about two minutes. She returned and informed me that Internal Affairs was investigating it.

I left the station and proceeded west on Fourth Street to where the brutal incident took place. Directly across from where it happened there is a gas station. I figured someone inside might have witnessed the incident. I went into the station and approached a gentleman of East Indian descent who appeared to be the manager. I asked him if he had witness the incident the day before. He became very uncomfortable, stated that he had not seen anything and did not want to get involved. I thanked him for his time and left. As I returned to my car I noticed that the Dollar Store next to the gas station might have a clear line of sight to where the incident occurred. I went into the store and talked with a lady who was operating the cash register. She said that she had been working the previous day but had not seen the incident. About that time a lady approached me. I assumed that she was just another customer. She said she was working there that day and she saw the entire thing. She asked, "are you the man the cops beat up?" I told her yes, and they had charged me with resisting arrest. She said "NO MISTER! I SAW THE WHOLE THING! YOU DID NOT RESIST THAT COP!" I asked her name and she supplied. I informed her that I might need her to testify to what she saw in court. She said that she couldn't afford to lose time from work. I told her I would personally reimburse her for any lost wages, but I couldn't hand the money to her directly. It would have to go through her store manager. Otherwise it would appear that I was paying for her testimony. I told her I would stay in touch and then asked where the motor oil was located. I picked up what I was going to purchase and was going to the cashier when one isle over I heard the lady I was talking to earlier, talking to another lady. She said that she had seen everything and that it was a damn shame that a young cop would beat down an old man like that.

Friday February 25, 2005 I returned to the Wilmington Police Department to inquire about the status of the Internal Affairs investigation. I went to the House Sergeants Office and was greeted by a gentleman of color. I don't remember if he had any appreciable rank.

I inquired as to the status of the investigation. He asked for my name, date and location of the incident, and if I remembered the arresting officers name or badge number. I gave him all the required information and like the Sergeant I talked to earlier, he went into that back room. After he had not returned for a few minutes, I took a seat. About five minutes later he returned with two pieces of paper in his hand. He told me he could find no indication of any Internal Affairs investigation involving the officer or me whose name and badge number I supplied him. I assured him that the previous point of contact (the lady Sergeant) assured me that there was an investigation. He held the two pieces of paper up to the glass and asked if she had given me one or both of the forms. I told him no. He slid both under the glass, told me to fill them out with as much detail as possible and return them when complete. I took the forms and left.

A week to ten days after the incident I was at the home of Ms. Margaret Edwards who resides on west Eighth Street between Madison and Monroe. We were in the middle of a family counseling session when a neighbor entered the house and informed all that there had been a shooting on the corner. I looked out her window and saw eight to ten police vehicles and numerous police personnel. On this particular day I was wearing a blue pin stripped suit, multi-colored silk tie and my ID badge was displayed on my left pocket. When I completed our session I informed Margaret that I was going up to the corner to see what happened. She gave me that look of hers as to subliminally say that's what got you into trouble in the first place. I went up to the corner, leaned against a wall and observed the officers doing their job. A young lady came up the street and stood by the pole. I recognized her as being a counselor or facilitator from the YWCA Center on Madison Street. She was dressed in a blue suit with white blouse and a non-descript yet tasteful piece of jewelry around her neck. She walked across the street and approached a young white detective and said something to him that I could not hear. The detective turned to her and held his hands palm outward, at waist level and said something to her. She returned to her original position at the pole. I asked her what had transpired and she told me that she inquired as to who had been shot. She said the detective told her that they were conducting an investigation and he couldn't supply any details at that time. I lit up a cigarette and continued to observe what was going on. The lady by the pole turned to me with a look of disgust, waved her hand across her nose, and proceeded back down the street toward the YWCA.
A few minutes later, a uniformed patrol officer stepped up to the door of the corner liquor store, shielded his eyes with both hands and looked in. I

walked across the street and asked him if it was the store owner who had got shot. He told me that the investigation was in progress and he couldn't give out any information. I thanked him for his time and consideration and returned to my original position across the street. About a minute later a young man wearing thug gear ( timberlands, oversized pants hanging off his behind and a hooded sweat jacket) walk right in the middle of the crime scene and approached the officer I had just spoken to. He said "YO, who got capped?" The officer replied "none of your damn business, keep moving". I said to myself. What is wrong with this picture. Three people. All individuals of color who basically asked the same question. Two were treated with respect and consideration, one was told to keep on moving. I will concede the fact that the individual in the thug gear did not articulate his question in an appropriate manner, but he asked the same question. Because he was not wearing a Brooks Brother's suit, does he deserve less respect and consideration than that afforded the lady or me on that day?

## NOTE OF INTEREST
## MY PERSONAL OPINION

I have seen several public officials, judges, school principals and clergyman, especially on weekends in the spring at places like Wal*Mart, Lowes, Home Depot and 84 Lumber who were dressed appropriately for the home or yard improvement job they were about to attempt. If I didn't know them personally, I would just pass them off as another Joe shmo. Regardless of what I wear. I am a human being. I am a degreed professional who goes out everyday and tries to make a difference. I pay my taxes and my alimony on time. I don't do any type of illegal drugs. I give of myself to the community. Even when they don't have a medical card and can't afford to pay my fee. Why did that officer do what he did that day? Only he and God know. Please excuse me if it appears that I am plagiarizing former President Bill Clinton's 60 Minute interview, but that officer did what he did to me because he could. He beat an old, disabled man down in the street with impunity. I am old enough to be his Father. How can a young man, any young man, beat an old disabled person down in the middle of a busy street and figure no one will notice it. What he did was not the actions of a trained and certified police professional. Those were the actions of a racist coward. He was in an L-car that day. IF something like that had occurred at 24 & Bowers Street in Riverside. IF the suspect was a young strong 25 year old buck. IF there happened to be three or four of his friends walking about the area.

Do you really think he would have jumped out of his car and beat that individual to the ground as he did me? Discretion is the greater part of valor. When these young boys and girls come out of the police academy they take an oath. Not much unlike the oath I took when I joined the army. They raise their right hand. They swear or affirm to protect and serve. To serve all the people in their jurisdiction. To protect those who can't protect themselves. A few years back, under Jim Sill's administration, a community policing initiative was to be developed. One objective was to establish better police/neighborhood dialect and communication. To enhance citizen and police cooperation. What that officer did on that day has set police/citizen cooperation back 20 years. Since the incident I have been to Southbridge, Riverside, Northeast, Hilltop merely doing my job. People who I have never seen in my life are calling me the Rodney King of Jackson Street. Just yesterday I was over on Franklin Street for a session. When I left the home three young men I recognized as drug dealers walked up to me, made arm gestures and said cha-ching, cha-ching. Some might say what that officer did to me was youthful exuberance or a professional anomaly. I submit that it was pure cowardice. He was wrong. Granted there was not videotape of the incident. But a disinterested third party with no ties to either of us will do just as well in civil court.


Olden "Pete" Thomas Jr., Ph.D., MSW, LCSW

Cc: James M. Baker, Mayor
    Michael J. Sczerba, Chief of Police
    Theodore Blunt, President, Wilmington City Council
    Officer In Charge, Wilmington Police Department Internal Affairs
    M. Jane Brady, Attorney General, State of Delaware
    Joseph R Biden Jr., Senator, State of Delaware
    Tom Carper, Senator, State of Delaware
    Mike Castle, Representative, State of Delaware
    National Association for the Advancement of Colored People
    Wilmington Chapter.
    Thomas Stephen Neuberger Esq., Attorney-at-Law
    US Department of Justice, Civil Rights Division
    Charles Potter Jr      Norman D. Griffith    Stephanie T. Bolden
    Hanifa G.N. Shabazz   Samuel Prado          Kevin F. Kelley Sr.
    Paul F. Ignudo        Gerald L. Brady       Loretta Walsh
    Michael A. Brown Sr.  Charles "Bud" Freel   Theopolis K. Gregory